IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ROBERT TALMAGE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 12-CV-174-PJC |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the | ) |
| Social Security Administration,[1] | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Claimant, Robert Talmage ("Talmage"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability insurance benefits and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Talmage appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Talmage was not disabled. For the reasons discussed below, the Court **REVERSES** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**

Talmage was 43 years old at the time of the hearing before the ALJ on August 19, 2011. (R. 27, 34). He graduated from high school. (R. 35).

In describing the reasons why he couldn't work, Talmage said that he had discs in his neck that were protruding and caused him pain and debilitating headaches. (R. 38). He said the pain was constant and felt like pressure against his neck. (R. 38-39). He said that sitting made his neck pain worse, and he said that he had to take precautions to keep his neck straight to avoid pain. (R. 39). He said he also had radiating pain down his right arm into his hand, and his hand would fall asleep two or three times a day. *Id.* Repetitive motion of his hand made the arm and hand pain worse. (R. 39-40).

Talmage said that he had major surgery on his left shoulder in December 2010 that involved reattaching many muscles. (R. 40). He had limited mobility and reach with his left arm because his shoulder was frozen. *Id.* He had been in physical therapy, but had not been able to complete it for financial reasons. *Id.* He said that he experienced severe constant pain that he would rate as 9 on a scale of 1 to 10. (R. 40-41).

Talmage said that he experienced problems with his back, and he had a fusion surgery in his low back. (R. 41-42). He said there was constant pain on his left side and his left hip. (R. 42). He said that walking, standing, or sitting too long would cause his feet to go to sleep. *Id.*

He had tried to lose weight, but his medications caused him to gain weight. (R. 42-43). His weight made his physical conditions worse. *Id.*

Talmage estimated that he could stand or walk for about 20 minutes before he would need to sit down. (R. 45). In an 8-hour day, he could be on his feet for 3 to 4 hours. (R. 45-46). In a chair that did not have good back support, he could sit for only 15 to 20 minutes before he

would need to change positions. (R. 46). He could sit for a total of 3 to 4 hours. *Id.* He thought he could fold laundry for 5 to 15 minutes, and then his shoulder would hurt and "start to lock up." (R. 46-47). He could rest for 10-15 minutes to get his shoulder to "calm down" before he could resume folding. (R. 47-48). After 2 sessions, he would stop folding and let someone else finish it, because he would find it too frustrating that his shoulder did not work properly. (R. 48).

Talmage was right-handed, and he estimated that he could write for 10 to 15 minutes before his hand would cramp up and he would need to let it rest. (R. 48-49). He thought it would take him an hour to write a 2-page note. (R. 49). He said that his girlfriend completed the Social Security paperwork because he didn't understand it, not because of an inability to complete the handwriting. (R. 49).

He could lift only 5 to 10 pounds without experiencing significant pain or problems. (R. 49-50). He spent about 40% of his time lying down, sometimes napping and sometimes remaining awake. (R. 50). He tried to do grocery shopping, and he would lean on the basket. (R. 50-51). After a while, he would be in pain, and he would need to rest for 5-15 minutes before he would be able to continue. *Id.* In Wal-Mart, he did not attempt to walk, and he sat on a bench and waited while another person shopped. (R. 51). He did not do any cooking that took more than 20 minutes, because he could not stand up for that long. (R. 51-52). He could not do the house cleaning chores. (R. 52). Vacuuming, for example, caused pain in his hips and back due to the repetitive motion. *Id.* He had a driver's license, and he occasionally drove. (R. 56). He said that he spent his day sitting on the couch, taking naps, and talking with his girlfriend. *Id.*

He had been diagnosed with post-traumatic stress disorder ("PTSD") and bipolar disorder, and those conditions also kept him from working. (R. 43). He suffered from severe depression. *Id.* He estimated that he was depressed 75% of the time and manic 25% of the time.

(R. 44). He said that his PTSD was caused by childhood physical abuse from his stepfather and sexual abuse from a family friend. (R. 44-45). He had a problem with anger, and he could become angry while waiting in line at a grocery store. (R. 51). He stayed in his house almost all the time, because he didn't "do well among people." (R. 52-53). He had experienced at least 3 panic attacks during which he felt like he was having a heart attack. (R. 53). He described himself as experiencing anxiety and paranoia. *Id.* He said the two places he went were the grocery store and the doctor's office. *Id.* He said that he saw his sons twice a year, and he had no problems interacting with them. (R. 54). Otherwise, he did not interact with anyone except his girlfriend. *Id.*

Talmage said that when he watched television, he would "phase out" and think about his own thoughts rather than pay attention to the show. (R. 55). While he previously had read 2 or 3 books a month, at the time of the hearing, he did no reading, because he could not remember what he had read. *Id.*

The administrative transcript includes records from Baptist Memorial Hospital in Memphis reflecting that Talmage had fusion surgery of L3/L4/L5/S1 levels in 2000. (R. 256-66).

Talmage saw Christopher W. Abshere M.D. for low back pain in May and June 2009. (R. 267-87). He was prescribed Lortab, Flexeril, and Medrol. (R. 268). It appears that he was also referred to a neurosurgeon. *Id.*

The administrative transcript includes a treatment plan and assessment dated March 4, 2010 with CREOKS Behavioral Health Services. (R. 308-24). The treatment plan, which appears to have been completed by a staff member with licensed practical counselor credentials,

states Axis I[2] diagnoses of severe PTSD and severe depression without psychotic features. (R. 308). It states Talmage's current Global Assessment of Functioning ("GAF")[3] as 48, with a highest in the past year of 50. A progress note with Vanessa Werlla, M.D. dated July 19, 2010 reflects that Talmage was told to discontinue Seroquel and was prescribed lithium, Depakote, and Trazodone. (R. 325). A progress note with Dr. Werlla dated September 13, 2010 continued Talmage's medications. (R. 354).

David A. Traub, M.D. saw Talmage on August 31, 2010 after Talmage was involved in a car accident on August 10, 2010. (R. 380). He assessed hyperextension injuries to the neck and thoracic spine, low back sprain, left shoulder sprain involving the rotator cuff, right shoulder sprain, and headaches. *Id.* He prescribed Lodine and Flexeril. *Id.*

The administrative transcript includes reports from MRIs completed on Talmage's left shoulder and cervical spine on September 16, 2010. (R. 356-59). On September 21, 2010, Dr. Traub saw Talmage again, and on examination Talmage still had clinical impingement syndrome in his left shoulder. (R. 379). Dr. Traub performed a steroid injection in the left shoulder and recommended one in Talmage's neck. *Id.* The neck injection was done on September 28, 2010.

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[3] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

(R. 378). On October 5, 2010, Dr. Traub said that he was concerned that there was more damage to Talmage's left shoulder than appeared on the MRI, and he referred him to Dr. Holt. (R. 377).

Gregory Holt M.D. saw Talmage on October 19, 2010, and he characterized the MRI of Talmage's left shoulder as showing mild degenerative changes and hypertrophy of the acromioclavicular joint and mild tendonitis at the supraspinatus with a possible partial thickness small tear at the rotator interval. (R. 360-61). Dr. Holt characterized the MRI of Talmage's neck as showing mild disk protrusions with no compromise of his spinal canal. (R. 360). He performed a subacromial injection, and he believed there was an "excellent chance" of resolving Talmage's shoulder discomfort without surgery. (R. 361). He prescribed physical therapy. *Id.*

Dr. Holt saw Talmage again on November 29, 2010 and stated that Talmage continued to have significant discomfort and his impression on examination was "refractory signs of impingement." (R. 371). He recommended arthroscopic surgery which he performed on December 16, 2010 and during which he performed multiple procedures on Talmage's left shoulder. (R. 371-72).

Talmage saw Dr. Traub on March 24, 2011, and he recommended that Talmage continue to pursue rehabilitation of his shoulder to regain as much function as possible. (R. 384). He thought that Talmage's continuing neck pain was from the C5/C6 disk, and he did not believe there was much more treatment to be done. *Id.* His opinion was that Talmage might continue to have chronic neck pain. *Id.* He released Talmage from his care. *Id.*

Dr. Holt saw Talmage on April 19, 2011 for follow up and said that Talmage had tightness and difficulty with range of motion of his left shoulder. (R. 385). Dr. Holt thought that Talmage was doing reasonably well and was improving. *Id.*

Talmage saw Dr. Werlla with CREOKS on February 28, 2011, and he reported having a "full-blown panic attack" the previous week after having physical therapy on his shoulder. (R. 401). Dr. Werlla stated Talmage's diagnoses as severe bipolar disorder, most recent episode depressed, without psychotic features; and pain disorder associated with both psychological factors and a general medical condition.[4] *Id.* Dr. Werlla continued Talmage's prescriptions of Depakote and Seroquel. *Id.* Dr. Werlla saw Talmage regularly from March through August 2011, and she continued the same diagnoses and prescriptions. (R. 396-400).

Dr. Werlla and a case manager with CREOKS completed a form entitled "Medical Source Opinion of Ability to Do Work-Related Activities (Mental) dated August 30, 2010. (R. 387). On this form, Dr. Werlla checked a box stating that Talmage could understand and remember 1- or 2-step instructions. *Id.* She indicated that Talmage had sufficient concentration to complete 1- or 2-step tasks. *Id.* She indicated that Talmage could not interact appropriate with the general public and could not function in close proximity to co-workers or supervisors. *Id.*

On February 22, 2011, Dr. Werlla and a case manager with CREOKS completed a second form with the same title. (R. 373-74). On this form, out of 17 mental activities listed, Dr. Werlla indicated that Talmage was markedly limited in 3 areas and moderately limited in 5. *Id.*

Agency consultant Subramaniam Krishnamurthi, M.D. completed a physical examination of Talmage and report dated June 11, 2010. (R. 289-96). Talmage's chief complaint was back pain. (R. 289). On examination, Dr. Krishnamurthi said that Talmage's gait was normal, but his

---

[4] Dr. Werlla used numerical codes to express her diagnoses. These codes are from the International Classification of Diseases, 9th edition - Clinical Model coding system, and this is a medically-recognized ranking of diagnoses. *See Little Company of Mary Hosp. v. Shalala*, 24 F.3d 984, 986-87 (7th Cir. 1994).

speed was slow due to back pain. (R. 290). He said that Talmage's heel and toe walking appeared normal, and Talmage was able to sit on the examination table without difficulty. *Id.* The range of motion of Talmage's dorsolumbar spine and hip joints was reduced due to pain. *Id.* Straight leg raising was positive. *Id.*

Janet G. Rodgers, M.D., a nonexamining agency medical consultant, completed a Physical Residual Functional Capacity Assessment on August 2, 2010. (R. 326-33). Dr. Rodgers determined that Talmage had the exertional capacity to perform light work. (R. 326). For narrative explanation, Dr. Rodgers reviewed the consultative examination of Dr. Krishnamurthi. (R. 327-28). Dr. Rodgers found no other limitations. (R. 328-33).

Agency consultant Maribeth Spanier, Ph.D. completed a mental status examination of Talmage and report dated June 15, 2010. (R. 298-305). Talmage told Dr. Spanier that his ability to work was affected by his "inability to concentrate, anger, inability to finish what I start, depression, and manic episodes." (R. 299-300). Dr. Spanier did not notice any physical handicaps, and Talmage's posture and gait were normal. (R. 304). Talmage's attention, concentration, and memory were considered to be adequate. *Id.* In Dr. Spanier's opinion, Talmage did not report enough symptoms to warrant a diagnosis of PTSD. *Id.* Her assessments on Axis I were bipolar disorder, mixed; victim of childhood physical and sexual abuse; and history of alcohol abuse, with one month partial remission. *Id.* She scored Talmage's GAF as 50. *Id.*

Nonexamining agency consultant Gary Lindsay, Ph. D., completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form on August 6, 2010. (R. 334-51). On the Psychiatric Review Technique form, for Listing 12.04 Dr. Lindsay noted Dr. Spanier's diagnosis of bipolar disorder, mixed. (R. 341). For Listing 12.06, he noted Talmage's

"recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress." (R. 343). For Listing 12.09, Dr. Lindsay noted Talmage's history of alcohol abuse. (R. 346). For the "Paragraph B Criteria,"[5] Dr. Lindsay found that Talmage had mild restriction of his activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 348). In the "Consultant's Notes" portion of the form, Dr. Lindsay summarized in some depth Talmage's treating history at CREOKS, as well as Dr. Spanier's consultative examination. (R. 350).

On the Mental Residual Functional Capacity Assessment form, Dr. Lindsay found marked limitations in Talmage's ability to understand, remember, and carry out detailed instructions. (R. 334). He found that Talmage had a moderate limitation in his ability to maintain attention and concentration for extended periods. *Id.* He found a marked limitation in Talmage's ability to interact appropriately with the general public. (R. 335). Dr. Lindsay found no other significant limitations. (R. 334-35). In narrative comments, Dr. Lindsay said that Talmage could perform simple work tasks, could relate to others on a superficial work basis, and could adapt to a work situation. (R. 336). He found that Talmage was unable to relate to the general public. *Id.*

---

[5] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

**Procedural History**

In April 2010, Talmage filed applications for Title II disability insurance benefits and for Title XVI supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (R. 148-56). The applications were denied initially and on reconsideration. (R.83-91, 99-104). A hearing before ALJ Charles Headrick was held on August 19, 2011. (R. 27-68). By decision dated October 24, 2011, the ALJ found that Talmage was not disabled. (R. 13-21). On February 14, 2012, the Appeals Council denied review of the ALJ's findings. (R. 1-6). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[6] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[6] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four,

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Talmage met insured status requirements through the date of the decision. (R. 15). At Step One, the ALJ found that Talmage had not engaged in substantial gainful activity since his alleged onset date of December 14, 2009. *Id.* At Step Two, the ALJ found that Talmage had severe impairments of degenerative disc disease; status post fusion at

---

where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

L4/L5 and L5/S1; status post arthroscopy of the left shoulder; obesity; bipolar disorder; and PTSD. *Id.* At Step Three, the ALJ found that Talmage's impairments did not meet the requirements of a Listing. (R. 16).

The ALJ found that Talmage had the RFC to perform light work with a limitation to simple work tasks, relating to others on a superficial basis, and minimal interaction with the general public. (R. 17). At Step Four, the ALJ found that Talmage was unable to perform any past relevant work. (R. 19). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Talmage could perform, taking into account his age, education, work experience, and RFC. (R. 20). Therefore, the ALJ found that Talmage had not been under a disability from December 14, 2009 through the date of the decision. (R. 21).

## Review

Talmage argues that the ALJ did not properly consider the opinion evidence, his credibility assessment was inadequate, and the RFC determination was not supported by substantial evidence. The Court agrees that the ALJ's RFC determination that Talmage could do work at the light exertional level was not supported by substantial evidence, and the ALJ's decision must therefore be reversed. Because reversal is required due to the lack of substantial evidence supporting the RFC determination, the other issues raised by Talmage are not addressed.

Here, the only evidence that reflected a finding that Talmage could do light work was the opinion evidence given by the nonexamining consultant Dr. Rodgers in the Physical Residual Functional Capacity Assessment dated August 2, 2010, affirmed later by a second nonexamining consultant, Kenneth Wainner, M.D. on November 17 and 30, 2010. (R. 326-33, 367-68). The difficulty is that one of Talmage's chief complaints at the hearing before the ALJ a year later on

August 19, 2011 was his limited use of his left shoulder, and the left shoulder injury occurred in a car accident on August 10, 2010. The treating records reflect that Talmage sought medical help within a short time after the accident, and he saw Dr. Traub and Dr. Holt regularly from August 2010 through April 2011. (R. 356-61, 371-72, 377-80, 384-85). Talmage had arthroscopic surgery on December 16, 2010, during which Dr. Holt performed multiple procedures on Talmage's left shoulder. (R. 371-72). Dr. Traub believed that Talmage might have continuing chronic neck pain, and he did not believe there was much treatment available for Talmage's neck. (R. 384). Dr. Holt said in April 2011 that Talmage had tightness and difficulty with range of motion of his left shoulder. (R. 385).

The ALJ relied on the opinions of Dr. Rodgers and Dr. Wainner to find that Talmage could perform light work. His relied on this evidence even though Dr. Rodgers' opinion was given before the August 2010 accident that injured Talmage's shoulder and Dr. Wainner's affirming opinions were given before the December 2010 surgery on Talmage's shoulder. Reliance on these opinions, given before a car accident, before completion of a significant treating history of nine months after that accident, and before surgery, is error. *Stephens v. Apfel*, 134 F.3d 383, 1998 WL 42524 at *2 (10th Cir.) (unpublished). In *Stephens*, the court had multiple problems with the ALJ's decision, but one was the "obvious" problem of using a "stale" 1989 consulting report instead of a current 1993 treating assessment. *Id.* More recently, the Tenth Circuit said that an ALJ's reliance on a "patently stale" opinion was "troubling," and the court encouraged the ALJ to obtain an updated exam or report on remand. *Chapo v. Astrue*, 682 F.3d 1285, 1293 (10th Cir. 2012).

Here the opinions of Dr. Rodgers and Dr. Wainner are stale because they were given before and in the midst of Talmage's treatment for a significant injury to his shoulder. The

13

comments of treating physicians Dr. Traub and Dr. Holt, that Talmage might have continuing chronic neck pain and that he continued to have problems with range of motion of his shoulder after the surgery, were more recent than the opinions of the nonexamining consultants and appear to have the potential of changing the determination that Talmage could perform light work. Under the circumstances of this case, the opinions of the nonexamining consultants were not substantial evidence supporting the ALJ's determination that Talmage could do light work.

Because the error of the ALJ related to the RFC determination requires reversal, the undersigned does not address the other contentions raised by Talmage. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Talmage.

This Court takes no position on the merits of Talmage's disability claim, and "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 31st day of May 2013.

_____
Paul J. Cleary
United States Magistrate Judge